# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

CLARENCE C. COSBY,                          )
                                       )
        Plaintiff,                          )
                                         )
    v.                          )          No. 4:14CV308 JCH
                                         )
STEAK N SHAKE OPERATIONS, INC.,             )
                                         )
        Defendant.                          )

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant Steak N Shake Operations, Inc.'s Motion for Summary Judgment, filed September 15, 2014. (ECF No. 20). The motion is fully briefed and ready for disposition.

## BACKGROUND

Plaintiff Clarence C. Cosby is a thirty-two year old black male. (Petition for Damages (hereinafter "Complaint" or "Compl."), ¶ 3). On or before December 30, 2009, Plaintiff was interviewed by Tina Moss, Defendant's Human Resources Manager, and Thomas Pannullo ("Pannullo"), Defendant's District Manager. (Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment ("Defendant's Facts"), ¶ 2). Plaintiff was hired by Defendant as a General Manager, the highest managerial position in any given restaurant or store (as they frequently are called), on December 30, 2009. (*Id.*, ¶¶ 1, 3). At the time he began his employment, Plaintiff received a copy of Defendant's Restaurant Associate Handbook ("Handbook"). (*Id.*, ¶ 26; Defendant's Exh. C). The Handbook described the types of leave available to employees, including Family Medical Leave Act ("FMLA") leave, Authorized Inactive Employment ("AIE") leave, and others not at issue here. (Defendant's Facts, ¶ 27;

Defendant's Exh. B, PP. 12-17). FMLA leave, designed to provide leaves of absence for family and medical reasons, was available to associates who had worked for Defendant for at least twelve months as of the date the requested leave was to begin. (Defendant's Exh. B, P. 12). The leave, while generally unpaid, allowed an associate to maintain his or her coverage for medical, dental, short-term disability and life insurance benefits. (*Id.*, P. 15). In contrast, the AIE leave policy operated as follows:

> Steak n Shake may provide an unpaid Authorized Inactive Employment (AIE) Leave under certain circumstances. AIE leave is available to those Associates who are in their first year of employment. AIE leaves are discretionary, not job protected and are subject to Steak n Shake's business needs. They may be granted in increments not to exceed thirty (30) days. All AIE time taken shall be added to the Associate's service date with the Company and an adjusted service date established. The adjusted service date will be used in determining seniority and eligibility for Company benefits. AIE leave requires the prior approval of the General Manager.
>
> In the event an Associate is granted an AIE leave of absence, the Associate's benefits will terminate immediately. If the Associate wishes to continue his/her Health and Welfare insurance coverage, they may do so by electing COBRA. Upon return to work, any coverage that was continued through COBRA will be immediately reinstated without a waiting period, enabling the Associate to have uninterrupted coverage while transitioning from COBRA to the group sponsored plan.

(*Id.*, P. 16).

Plaintiff's employment with Defendant began with centralized training for managers, followed by on-the-job training in several stores under different managers. (Defendant's Facts, ¶ 3). On or about March 17, 2010, Plaintiff was assigned as General Manager to his own store, Store 60. (*Id.*, ¶ 4). At all times that Plaintiff acted as General Manager of Store 60, Pannullo was his direct supervisor. (*Id.*, ¶ 5).

Defendant measures its stores' performance by looking at profits, and by using certain metrics, including items such as drive-thru times, customer complaints, food cost variance and

labor hours. (Defendant's Facts, ¶ 6). During 2010, Plaintiff was verbally counseled by Pannullo on several occasions, regarding his ongoing failure to be at work when scheduled (Plaintiff both missed scheduled shifts and often was tardy), his difficulty in holding his junior managers accountable, and the turnover in his team members that resulted in the restaurant being run understaffed. (*Id.*, ¶ 7). On September 4, 2010, Pannullo issued Plaintiff a written performance counseling, in which he identified six metrics in which Plaintiff's store was underperforming.[1] (*Id.*, ¶ 8). In the September 4, 2010 memo, Pannullo further stated as follows:

> In addition to the above mentioned measures, Clarence has had issues regarding being at the restaurant when scheduled, holding his managers accountable and has lost team members and been forced to run understaffed. Clarence and I have had several verbal discussions regarding the above mentioned incidents without a correction in course. This documentation is to serve as a warning that if performance and leadership does not change immediately further disciplinary action will result, up to and including termination.

(*See* Defendant's Exh. P). Plaintiff signed the September 4, 2010, performance counseling memorandum without comment. (*Id.*).

On October 26, 2010, Pannullo issued Plaintiff a second written performance counseling, titled a "Conversation Confirmer." (Defendant's Facts, ¶ 11). This document noted that Plaintiff had missed a shift on October 17, 2010, and had failed to improve the store's metrics. (*See* Defendant's Exh. Q). It further stated that Plaintiff had failed to complete a new product roll-out by the October 25, 2010 deadline. (*Id.*). The Conversation Confirmer continued as follows:

> Based on Clarence's failure to move the store forward after our last counseling, I informed Clarence of my intention to take him out of the GM position. Clarence understands that failure to conduct himself in a professional manner and failure to maintain his store short term can result in further disciplinary action, up to and including termination.

---

[1] These metrics included TCT complaints, drive thru times, QSC, food variance, labor hours, and cash exceeding budget. (*See* Defendant's Exh. P).

(*Id.*).  Rather than terminate Plaintiff's employment, Pannullo instead decided to demote Plaintiff to the position of Restaurant Manager, a position one step below General Manager.  (Defendant's Facts, ¶ 18).  Plaintiff admits that he received the performance counseling on or about October 26, 2010, and that he signed the October 26, 2010, Conversation Confirmer without comment. (*Id.*, ¶¶ 15, 16).  Plaintiff's demotion to Restaurant Manager went into effect on November 17, 2010.  (*Id.*, ¶ 19).[2]

At some point in late October or early November, 2010, Plaintiff informed Pannullo that he was having problems at home and might need to take a leave of absence.  (Defendant's Facts, ¶ 21).  Specifically, Plaintiff told Pannullo that his then-girlfriend was moving to Kansas City, and taking their young son with her.  (*Id.*).[3]  Plaintiff then failed to show up for work on November 8, 2010, and for the following eight days.  (*Id.*, ¶ 22).  Defendant had no notice that Plaintiff officially was requesting a leave of absence until November 16, 2010, when it received a faxed Short Term Disability Claim Form, signed by Plaintiff, in its Indianapolis benefits department.  (*Id.*, ¶¶ 22, 23).  The form, signed by a Dr. Imran Chisti, stated that Plaintiff had been diagnosed with major depression, and that he was "unable to perform management or line staff duties."  (*Id.*, ¶ 24; Defendant's Exh. U).  Dr. Chisti further indicated that Plaintiff's expected return to work date was "unknown."  (*Id.*).  On November 18 and 19, 2010, Plaintiff

---

[2] Plaintiff maintains he was not demoted on October 26, 2010; instead, Plaintiff asserts the demotion occurred while he was on leave in November, 2010.  (Plaintiff's Statement of Additional Material Facts in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Additional Facts"), ¶¶ 14, 28-30).  Defendant admits the demotion did not go into effect until November, but correctly notes Plaintiff signed the Conversation Confirmer unambiguously notifying Plaintiff of his demotion on October 26.

[3] Plaintiff claims he also told Pannullo that he had found lumps in his prostate.  (*See* Plaintiff's Nov. 2012 Dep., PP. 230-31).  Plaintiff admittedly never saw a doctor for this alleged condition, however, and his Short Term Disability Claim Form listed only a psychological problem, i.e., major depression, as the basis for his requested leave.  (*See* Plaintiff's Aug. 2013 Dep., PP. 36-38; Defendant's Exh. U).

faxed Defendant two notes from CenterPointe Hospital, dated November 8 and 18, 2010, respectively, and titled "Authorization to Return to Work." (*See* Defendant's Exh. R). The notes stated only that as of November 8, 2010, Plaintiff was under the care of a Dr. Azfar Malik, and that the date of his expected return to work without restrictions was unknown. (*Id.*). The notes did not specify a condition for which Plaintiff was receiving treatment. (*Id.*). After receiving Plaintiff's Short Term Disability Claim Form, Defendant's benefits department approved Plaintiff for AIE leave effective November 8, 2010. (Defendant's Facts, ¶ 32).[4] Upon this approval, Plaintiff's benefits were automatically terminated in accordance with the AIE leave policy. (*Id.*, ¶ 36).[5] Defendant further approved Plaintiff for short term disability ("STD") benefits in accordance with Defendant's Short Term Disability Plan. (*Id.*, ¶ 33). The benefits available pursuant to the STD policy consisted solely of income replacement, however. (*Id.*, ¶ 34).

On or about January 22, 2011, Plaintiff returned to work from his AIE leave. (Defendant's Facts, ¶ 42). At that time, he was presented with a Performance Deficiency Letter memorializing the facts that his performance as General Manager of Store 60 had been unacceptable, and that he had been demoted to Restaurant Manager effective November 17, 2010. (*Id.*). Specifically, the Performance Deficiency Letter stated as follows:

As per the conversation that took place on November 3, 2010[6] between you,

---

[4] Plaintiff admits that no one made any negative comments about his race or alleged disability in connection with his taking a leave of absence. (Defendant's Facts, ¶ 41).

[5] Defendant therefore sent Plaintiff a COBRA notice on December 7, 2010, informing Plaintiff that in order to elect COBRA continuation coverage he had to complete the Election Form and return it to Defendant. (Defendant's Facts, ¶¶ 37, 38). Plaintiff admits that he received the COBRA notice and signed the Election Form, but maintains he never made any payments for COBRA continuation coverage because he could not afford the payments. (*Id.*, ¶¶ 39, 40). As such, his health insurance coverage terminated when he went out on AIE leave. (*Id.*, ¶ 40).

[6] Plaintiff maintains the purported November, 2010 meeting never took place. (Plaintiff's Additional Facts, ¶¶ 51-52). Plaintiff offers only his own unsupported declaration in support of

Thom Pannullo and Micky Pfeiffer[7], this letter documents that you had poor performance as a General Manager at our Steak n Shake restaurant located at 5828 South Lindbergh, St. Louis, Missouri (the "Restaurant"). Please allow this Performance Deficiency letter to memorialize these deficiencies, as well as provide you with a final warning that future performance deficiencies can result in further disciplinary action, up to and including the immediate termination of your employment, without further notice….

As per the conversation on November 04, 2010, it was discussed that you would be demoted to a Restaurant Manager with your salary adjusted to $38000 per year effective November 17, 2010. We were unable to formalize this action with written documentation before your unauthorized leave of absence that began on November 08, 2010.

Based on the foregoing, Steak n Shake has been exceedingly lenient with your numerous performance deficiencies. We certainly value you as an employee and we are optimistic your performance will improve. However, because of the severity of the deficiencies, please consider this Performance Deficiency Letter to acknowledge the expectation of your performance to be at or above Company standards. Failure to do so will result in further disciplinary action, up to and including, termination.

(Defendant's Exh. Z). Plaintiff signed the Performance Deficiency Letter without comment. (*Id.*).[8]

Because Plaintiff was moving to the position of Restaurant Manager, Pannullo assigned him to a new store, Store 253. (Defendant's Facts, ¶ 44). The General Manager at Store 253 was Dallas Noll ("Noll"), but Pannullo was the District Manager over Plaintiff's new store, and thus remained involved in managing Plaintiff. (*Id.*). As a Restaurant Manager, Plaintiff

---

this assertion, however, while Defendant offers the testimony of both Pannullo and Pfeiffer, and Pfeiffer's calendar from the date in question, to support its claim the meeting occurred. (*See* Defendant's Response to Plaintiff's Statement of Additional Facts ("Defendant's Response to Plaintiff's Additional Facts"), ¶ 52; Defendant's Exh. QQ). In any event, the Court finds whether or not the November 3 meeting took place to be irrelevant, as Plaintiff admittedly signed the October 26, 2010, document confirming his demotion before he went out on leave.

[7] Micky Pfeiffer ("Pfeiffer") was Defendant's Human Resources Manager. (Defendant's Facts, ¶ 53).

[8] Plaintiff claims that before he could return to work, Pannullo informed him he was required to sign the Performance Deficiency Letter or be terminated. (Plaintiff's Additional Facts, ¶ 49). Plaintiff offers nothing more than his own declaration to support this statement, however.

exhibited the same tardiness and attendance problems as when he was a General Manager. (*Id.*, ¶ 46). He was verbally counseled on these issues throughout 2011[9], and received written performance counseling from Pannullo on January 24, 2011. (*Id.*; Defendant's Exh. AA).

On or about May 9, 2011, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission and Missouri Commission on Human Rights, alleging race and disability discrimination. (Defendant's Facts, ¶ 47; Defendant's Exh. KK). In June, 2011, Plaintiff got into a verbal altercation with another manager at Store 253, but was not disciplined. (Defendant's Facts, ¶¶ 48, 49). On July 21, 2011, Plaintiff and Defendant participated in an unsuccessful mediation at the EEOC office in St. Louis. (Plaintiff's Additional Facts, ¶ 63).

On or about August 6, 2011, Plaintiff got into a verbal and physical altercation with a subordinate employee named Josh at Store 253. (Defendant's Facts, ¶ 50). According to Plaintiff, Josh became threatening and violent with Plaintiff; Plaintiff terminated Josh and instructed him to leave the building[10]; Josh refused to leave; and Plaintiff grabbed Josh by the arm and escorted him from the building. (Plaintiff's Response to Defendant's Statement of Undisputed Material Facts, ¶ 50). Pannullo and Pfeiffer investigated the incident. (Defendant's Facts, ¶ 53). Although they determined that Plaintiff had violated Defendant's disciplinary

---

[9] Plaintiff characterizes this counseling as "harassment," occasioned by his filing of the Charge of Discrimination. (Plaintiff's Additional Facts, ¶ 59). Defendant counters that although Plaintiff was verbally counseled throughout 2011 for tardiness and absenteeism, he was counseled for those same issues in 2010, before he filed his charge or otherwise opposed discrimination. (Defendant's Response to Plaintiff's Additional Facts, ¶ 59).

[10] According to Defendant, only General Managers have the authority to terminate associates. (Defendant's Reply in Support of its Statement of Undisputed Facts in Support of Defendant's Motion for Summary Judgment, ¶ 50; Defendant's Exh. N).

policy, they declined to terminate Plaintiff's employment[11], and instead decided to issue a Written Disciplinary Action. (*Id.*; Defendant's Exh. II).

On or about August 15, 2011, while the investigation of the August 6, 2011, incident was ongoing, Pannullo and Pfeiffer learned that Plaintiff's driver's license had been revoked or suspended. (Defendant's Facts, ¶ 54). Defendant had a driving policy in effect, which stated as follows:

> The ability to legally and safely drive a motor vehicle is an essential function of the job for all Steak n Shake Managers, Restaurant Managers, General Managers, and District Managers (collectively referred to herein as "Manager"). Any Manager that loses the ability to legally and safely drive a motor vehicle ("Driving Privileges") is subject to discipline up to and including termination. Additionally, any Manager who loses his or her Driving Privileges (whether temporarily or permanently) must immediately do the following:
>
> 1. Cease operating his or her motor vehicle for any purpose that in any manner benefits Steak n Shake. For example, a Manager who loses his or her Driving Privileges shall not drive to the bank during work hours, drive to other Steak n Shake units during work hours, or drive his or her motor vehicle for any other reason which in any manner benefits Steak n Shake.
>
> 2. Contact his or her Regional Director of Operations/Director of Operations within 24 hours after learning about the loss of Driving Privileges. In conjunction with this initial report, the Manager must supply a written description of the events that triggered the loss of Driving Privileges accompanied by any relevant written legal/court documents. This initial report should also include information relating to the circumstances required to regain the Manager's Driving Privileges. Upon receipt of this information, the Regional Director of Operations/Director of Operations will consult with Steak n Shake's Senior Vice President of Human Resources to evaluate the Manager's eligibility for continued employment. Failure to strictly adhere to the above requirements shall result in discipline up to and including immediate termination.

---

[11] Defendant's Handbook specifically provides that an employee's employment may be terminated without prior notice or disciplinary action for a variety of reasons, including a physical assault or battery of another associate or guest, or "[a]ny other activity that the Company reasonably believes will negatively interfere with the smooth operation, goodwill or profitability of its business." (Defendant's Exh. B, P. 26).

(Defendant's Exh. F).[12]  The manner in which Plaintiff handled the revocation/suspension of his license violated Defendant's policy in several ways:  he did not inform his General Manager, Noll, within twenty-four hours of the suspension; he never personally informed his regional or district managers of the suspension, nor did he provide the written report required by the policy; and he only stopped driving his car to conduct business for Defendant after he told Noll about the suspension.  (Defendant's Facts, ¶¶ 58, 59).  Although Plaintiff's conduct would have supported the termination of his employment, Pannullo and Pfeiffer again decided only to issue a written warning.  (*Id.*, ¶ 62; Defendant's Exh. HH).

Pannullo and Pfeiffer issued both Written Disciplinary Actions to Plaintiff on August 19, 2011.  (*See* Defendant's Exhs. HH, II).  Plaintiff refused to sign the Written Disciplinary Action regarding the grabbing incident, but declined to give a reason for his refusal.  (Defendant's Exh. II).  Plaintiff also refused to sign the written warning regarding the suspension of his license, maintaining the warning should have been verbal.  (Defendant's Exh. HH).  Plaintiff admits that he engaged in the conduct that resulted in the write-ups, however.  (Defendant's Facts, ¶ 66).  According to Plaintiff, at the conclusion of the meeting Plaintiff asked about his future with the company, and Pfeiffer laughed at him.  (Plaintiff's Additional Facts, ¶ 75).[13]

Shortly after meeting with Pannullo and Pfeiffer regarding the disciplinary actions, Plaintiff informed Pannullo he was considering resigning.  (Plaintiff's Additional Facts, ¶ 78).

---

[12] Plaintiff acknowledges that he understood and agreed to the terms of this policy when he began employment on December 30, 2009.  (Defendant's Facts, ¶ 57).

[13] Defendant again notes that Plaintiff cites to nothing more than his own self-serving declaration to support this allegation.  (Defendant's Response to Plaintiff's Additional Facts, ¶ 75).  Defendant further notes that Pfeiffer specifically testified she never intended to force Plaintiff to resign by issuing the written warnings.  (*Id.*, ¶ 76, citing Defendant's Facts, ¶ 71).

According to Plaintiff, Pannullo said "this" would continue if Plaintiff stayed. (*Id.*, ¶ 79).[14]

Plaintiff then informed both Noll and Pannullo that he was resigning from his employment with Defendant. (Defendant's Facts, ¶ 70). Plaintiff claims that the discipline he received on August 19, 2011, together with his belief that he would continue to receive discipline, led to his resignation. (*Id.*, ¶ 72). Plaintiff admittedly had another job lined up at the time that he resigned, however, and in fact began working for Cajun Operating Company d/b/a Church's Chicken ("Church's Chicken"), on September 7, 2011, after a brief voluntary hiatus. (*Id.*, ¶¶ 73, 74).[15]

Later on August 19, 2011, Noll wrote Pfeiffer the following email:

> Shortly after you left the store today Clarence came back to the office and told Thom and I that he was tired and physically spent with all that has been going on and was thinking about resigning. Thom told him he should take some time to figure it out and make a decision after some thought about it. Clarence walked up front for a few minutes and came back again to talk to Thom and stated he made up his mind and was ready to resign. Thom and Clarence then went in the dining room to discuss this. Minutes later Clarence came back to the office to shake my hand and say his goodbyes to everyone.

(Plaintiff's Exh. 17). Pfeiffer responded to Noll's email as follows: "Thanks!!! This is perfect! Have a GREAT weekend!!" (*Id.*). On August 29, 2011, Defendant's employee, Katherine Lewis, asked Pfeiffer how Plaintiff's termination should be classified, "+ or –?". (Plaintiff's Exh. 18). Pfeiffer responded: "Is there such a thing as a HUGE plus?? He walked out middle of shift after Thom and I wrote him up for a few issues. He has a pending EEOC case and his attorney probably said we were retaliating against him." (*Id.*).

On or about February 17, 2012, Plaintiff filed his Complaint in this matter in the Circuit

---

[14] Once again, Plaintiff cites to nothing more than his own declaration to support this allegation. Furthermore, Defendant notes that "[e]ven if Pannullo did make such a statement, he very easily could have meant that if Plaintiff did not improve his performance and stop engaging in violations of company policies, then he would continue to be disciplined for such misconduct." (Defendant's Response to Plaintiff's Additional Facts, ¶ 79).

[15] Plaintiff had applied for employment with Church's Chicken on March 23, 2011. (*See* Defendant's Exh. VV).

Court of St. Louis County, Missouri, asserting claims for race discrimination, disability discrimination, retaliation, and retaliation/constructive discharge, all in violation of the Missouri Human Rights Act, § 213.010 RSMo. *et seq.* ("MHRA"). (*See* Complaint, ECF No. 4). Originally named as Defendants were Steak N Shake Operations, Inc., Biglari Holdings, Inc., d/b/a Steak N Shake, John Doe Corporate Entity, and Thom Pannullo, a Missouri citizen. (*Id.*, ¶¶ 4-6, 8-10). On or about February 10, 2014, Plaintiff voluntarily dismissed Defendants Biglari Holdings, Inc., John Doe Corporate Entity, and Pannullo. (*See* ECF No. 1-4). Defendant then removed the case to this Court on February 20, 2014, on the basis of diversity of citizenship. (ECF No. 1).

As stated above, Defendant filed the instant Motion for Summary Judgment on September 15, 2014, claiming there exist no genuine issues of material fact and Defendant is entitled to judgment as a matter of law. (ECF No. 20).

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id*.

A moving party always bears the burden of informing the Court of the basis of its motion. *Celotex*, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material

fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. *Anderson*, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 255. The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Id.* at 249.

## DISCUSSION

## I. Termination Of Health Care Benefits

In Counts I and II of his Complaint, Plaintiff alleges his health insurance benefits were terminated as a result of race and disability discrimination, respectively. In Count III, he alleges the termination of his health insurance benefits was the result of retaliation. As noted above, however, Defendant's Handbook clearly provided that an associate of less than one year, such as Plaintiff, was entitled only to AIE leave. (Defendant's Facts, ¶ 29-31; Defendant's Exh. B, PP. 12, 16). AIE leave did not entitle an associate to a continuation of his health insurance benefits; rather, its terms specifically provided that "[i]n the event an Associate is granted an AIE leave of absence, the Associate's benefits will terminate immediately," leaving an election to participate in COBRA as the only method by which such associate could continue coverage. (Defendant's Exh. B, P. 16). Defendant thus maintains that because Plaintiff's placement on AIE leave resulted in the automatic termination of benefits, he cannot establish a claim of race or disability discrimination or retaliation based on the fact that his health care coverage was terminated during his leave of absence. (Defendant's Memorandum in Support of its Motion for Summary Judgment ("Defendant's Memo in Support"), PP. 9-10).

By way of response, Plaintiff notes that Judy Mason, a Benefits Specialist for Defendant,

prepared a memo and testified via deposition that it was error to characterize Plaintiff's leave as AIE, and that he was entitled to maintain his health insurance benefits while on leave. (Plaintiff's Memorandum in Opposition of Defendant Steak n Shake Operations, Inc.'s Motion for Summary Judgment ("Plaintiff's Opp."), P. 8, citing Mason Dep., P. 18). Ms. Mason later explained that her statement was based on the erroneous assumption that Plaintiff was entitled to FMLA leave, however, when in fact he was not as he had not been employed by Defendant for the requisite amount of time prior to taking the leave. (*See* Defendant's Exh. ZZZ, ¶ 23). Ms. Mason's misstatement did not entitle Plaintiff to benefits he otherwise was not entitled to receive under Defendant's lawful[16] and clearly articulated leave policies. Under these circumstances, the Court finds Defendant's Motion for Summary Judgment on Plaintiff's claims regarding the discontinuation of his health insurance benefits must be granted.

## II.    Race And Disability Discrimination

The MHRA prohibits employers from discriminating against individuals based upon race or disability. *See* Mo.Rev.Stat. § 213.055. "To establish a prima facie case of discrimination in the workplace, a plaintiff must show that he (1) was a member of a protected class; (2) was qualified to perform his job; (3) suffered an adverse employment action; and (4) was treated differently from a similarly situated person not a member of the protected class." *Stull v. Fireman's Fund Ins. Co.*, 2012 WL 3815647, at *6 (E.D. Mo. Sep. 4, 2012), citing *Ressler v. Clay County*, 2012 WL 2285980, at *7 (Mo. App. Jun. 19, 2012). The fourth element also may be proved by "other evidence that would give rise to an inference of unlawful discrimination."

---

[16] The Court notes that the FMLA itself defines an "eligible employee" as one who has been employed "for at least 12 months by the employer with respect to whom leave is requested…" *See* 29 U.S.C. § 2611(2)(A).

*Ruppel v. City of Valley Park*, 318 S.W.3d 179, 185 (Mo. App. 2010) (internal quotations and citation omitted).

"When reviewing cases under the MHRA, courts are guided by both Missouri law and any federal employment discrimination law consistent with Missouri law." *Hood v. Aaron Rents, Inc.*, 2009 WL 4828709, at *2 (E.D. Mo. Dec. 7, 2009) (internal quotations and citation omitted). For example, both Title VII and the MHRA require a plaintiff to show, "among other things, that [his] job performance met [his] employer's legitimate expectations." *Id.* (citations omitted). The Missouri Supreme Court has determined that the MHRA may offer greater discrimination protection than that available under federal standards, however. *See Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 818-19 (Mo. banc 2007). Missouri courts thus no longer apply the *McDonnell Douglas*[17] burden shifting analysis, instead applying a standard derived from Missouri's approved pattern jury instructions pursuant to which an MHRA discrimination claim survives summary judgment, "if there is a genuine issue of material fact as to whether [the protected characteristic] was a 'contributing factor' in [defendant's employment] decision." *Id.* at 820; *see also McCullough v. Commerce Bank*, 349 S.W.3d 389, 397 (Mo. App. 2011). "This standard offers greater protection than the federal one because a contributing factor need only have a part in producing the [discriminatory] effect." *Stull*, 2012 WL 3815647, at *7 (internal quotations and citations omitted).

In his Complaint, Plaintiff alleges that race and/or disability were contributing factors in Defendant's decision to demote him from General Manager to Store Manager. (Compl., ¶¶ 30, 44-47, 50-54). Defendant counters that with this claim Plaintiff fails to establish the second element of his prima facie case, that he was qualified to perform his job, and the fourth, that he

---

[17] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

was treated differently from a similarly situated person not a member of the protected class, and/or that other evidence exists giving rise to an inference of unlawful discrimination. (Defendant's Memo in Support, PP. 3-6).[18]

With respect to whether Plaintiff was meeting Defendant's legitimate expectations, the Court notes that it is undisputed Plaintiff was verbally counseled by Pannullo on several occasions in 2010, regarding his ongoing failure to be at work when scheduled, his difficulty in holding his junior managers accountable, and the turnover in his team members that resulted in the restaurant being run understaffed.  (Defendant's Facts, ¶ 7).  Pannullo memorialized the problems in a September 4, 2010, written performance counseling, in which he identified both the metrics in which Plaintiff's store was underperforming, and the personal difficulties Plaintiff exhibited during his tenure.  (*Id.*, ¶ 8; Defendant's Exh. P).  Plaintiff signed the September 4, 2010, counseling memorandum without comment, thereby acknowledging if not conceding Defendant's concerns regarding his performance deficiencies.  *See Gibson v. American Greetings Corp.*, 670 F.3d 844, 854-55 (8th Cir.) (affirming grant of summary judgment on race discrimination where plaintiff refused to include comments on Defendant's written performance warnings), *cert. denied*, 133 S.Ct. 313 (2012).

With respect to the fourth element, as noted above one method by which Plaintiff could establish such is by providing "'specific, tangible evidence that employees who were similarly situated in all respects to him received different treatment from' the employer."  *Allen v. Missouri*, 2013 WL 2156259, at *11 (E.D. Mo. May 17, 2013), quoting *Philip v. Ford Motor Co.*, 413 F.3d 766, 768 (8th Cir. 2005).  For his race claim Plaintiff maintains such evidence

---

[18] Defendant assumes for purposes of its motion only that Plaintiff can establish he was a member of a protected class as to both race and disability, and that his demotion from General Manager to Restaurant Manager was an adverse action.  (Defendant's Memo in Support, P. 3).

exists, as similarly situated Caucasian employees allegedly were treated more favorably than Plaintiff. (Plaintiff's Opp., P. 11). As support for this assertion Plaintiff cites to his own declaration, in which he attested as follows: "Caucasian managerial employees working in the St. Louis Division have taken leaves of absence without being demoted….during their respective leaves." (Declaration of Clarence Cosby, ¶ 59).

By way of reply, Defendant states as follows: "Plaintiff's entire argument in this regard is based on nothing more than one conclusory sentence in his declaration. Plaintiff provides absolutely no detail regarding the Caucasian employees to which he refers, including their names, their managers, when they allegedly took their leaves of absence, etc. Plaintiff also proffers absolutely no evidence that they were similarly situated to him—there is nothing in the record on those alleged managers' performance, length of employment, or the paperwork they provided to support their leaves of absence (for example, perhaps these unnamed managers were entitled to FMLA leave, whereas Plaintiff was not)." (Defendant's Reply in Support of its Motion for Summary Judgment, PP. 6-7).

"The test for whether employees are 'similarly situated' is a 'rigorous' one." *Stull*, 2012 WL 3815647, at *8 (citation omitted). Plaintiff, "has the burden of demonstrating there were individuals similarly situated in all relevant aspects to him by a preponderance of the evidence." *Allen*, 2013 WL 2156259, at *11, citing *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000). Here, Plaintiff's vague allegation fails to establish a genuine issue of material fact with respect to whether similarly situated employees were treated differently than he. *See Stull*, 2012 WL 3815647, at *10. *See also Davenport v. Riverview Gardens School Dist.*, 30 F.3d 940, 945 (8th Cir. 1994) (affirming the grant of summary judgment when the plaintiff maintained similarly situated employees were treated differently, but failed to provide evidence of such other than his

own unsubstantiated allegations during his deposition); *Hood*, 2009 WL 4828709, at *5 (same); *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 521 (8th Cir. 2010) (affirming the grant of summary judgment when plaintiff failed to provide sufficient detail to permit the court to determine whether the individuals named were in fact similarly situated to plaintiff).

While the Court recognizes that Plaintiff is not required to show similarly situated employees were treated differently in order to satisfy the fourth element of his prima facie case, Plaintiff offers nothing else tending to give rise to an inference of unlawful discrimination. *See Ruppel*, 318 S.W.3d at 185. To the contrary, with respect to his race discrimination claim Plaintiff admits that Pannullo participated in the decision to hire Plaintiff, and then effected his demotion less than one year later. (*See* Defendant's Facts, ¶¶ 2, 13-14). Under these circumstances, "an inference arises that his decision was not motivated by discriminatory animus." *Owens v. U.S. Dept. of Army*, 312 Fed.Appx. 831, 835 (8th Cir. 2009), citing *Peterson v. Scott County*, 406 F.3d 515, 522 (8th Cir. 2005) ("This court has previously observed that it is not likely that a supervisor would hire an older woman and then discriminate against her on the basis of her age and gender.") (citation omitted); *Herr v. Airborne Freight Corp.*, 130 F.3d 359, 362-63 (8th Cir. 1997) ("There is a strong inference that discrimination was not a motivating factor if the same person hired and fired the plaintiff within a relatively short period of time.") (citation omitted). *See also Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328, 1337 (8th Cir. 1996). Plaintiff thus fails to establish a genuine issue of material fact as to whether his race was a contributing factor in Defendant's employment actions. *See Stull*, 2012 WL 3815647, at *10.

With respect to his claim of disability discrimination, as noted above Plaintiff signed a Conversation Confirmer on October 26, 2010, in which Pannullo announced his intention to remove Plaintiff from the position of General Manager. (Defendant's Facts, ¶ 11; Defendant's

Exh. Q). At some point either shortly before or after this document was signed, Plaintiff informed Pannullo that he was having problems at home regarding his then-girlfriend, and might need to take a leave of absence. (Defendant's Facts, ¶ 21). Plaintiff did not mention that he was suffering from depression at that time, however; instead, it was not until November 16, 2010, when Defendant received a faxed Short Term Disability Claim Form signed by Plaintiff and Dr. Chisti, that Defendant received notice Plaintiff had been diagnosed with major depression. (*Id.*, ¶¶ 22-24; Defendant's Exh. U). "Without knowledge of [Plaintiff's major depression, Defendant] could not have discriminated against [him] because of [it]." *Liljedahl v. Ryder Student Transp. Services, Inc.*, 341 F.3d 836, 842 (8th Cir. 2003) (citation omitted). Plaintiff thus fails to establish a genuine issue of material fact as to whether his disability was a contributing factor in Defendant's alleged employment actions. *See Stull*, 2012 WL 3815647, at *10.

## III. <u>Retaliation</u>

The MHRA makes it unlawful for an employer "[t]o retaliate or discriminate in any manner against any other person because such person has opposed any practice prohibited by this chapter or because such person has filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding or hearing conducted pursuant to this chapter." *See* Mo.Rev.St. § 213.070. Thus, "[t]o establish a prima facie case of retaliation under the MHRA, a plaintiff must prove that: (1) he complained of discrimination; (2) the employer took adverse action against him; and (3) a causal connection existed between the complaint and the adverse action." *Griffey v. Daviess/DeKalb County Regional Jail*, 2012 WL 10881, at *7 (W.D. Mo. Jan. 3, 2012) (citation omitted). Plaintiff need not show that retaliation was a substantial or determining factor in the employment decision; rather, "proving a causal connection between the

complaint and the adverse action depends on showing that the complaint was a contributing factor in the adverse action." *Id.* (citation omitted).

In its motion, Defendant asserts Plaintiff's claim of retaliatory demotion necessarily fails, because Plaintiff cannot establish that he had engaged in any protected activity under the MHRA at the time of the demotion decision in October, 2010. (Defendant's Memo in Support, PP. 6-8). Plaintiff attempts to establish a genuine issue of material fact as to this element, by attesting in his declaration as follows: "In late October, I informed Pannullo that I believed I was being treated unfairly, and that I also believed my race was partly to blame." (Declaration of Clarence Cosby, ¶ 12). Plaintiff's assertion is belied by his own deposition testimony, however, as follows:

> Q    But did you ever actually tell [Pannullo] I believe I'm being discriminated against on the basis of my race by the company?
>
> A    I don't know if I actually had that conversation with him.
>
> Q    Did you ever tell anybody at Steak N Shake that you thought you were being discriminated against because of your race while you were employed by the company?
>
> A    Other than [Noll], no….
>
> Q    That was the conversation in about, when you came back to work in about January?
>
> A    Yes.[19]
>
> Q    Okay. Did you ever tell anybody at the company that you believe you were being discriminated against because of a disability while you were employed?
>
> A    No.

(*See* Plaintiff's Aug. 2013 Dep., PP. 194-195). Under these circumstances, the Court finds Plaintiff fails to create a genuine issue of material fact, sufficient to survive Defendant's Motion

---

[19] It is undisputed that the allegedly retaliatory demotion took effect prior to January, 2011.

for Summary Judgment on this issue.  *See Gibson*, 670 F.3d at 857 (internal quotations and citation omitted) ("A party's unsupported self-serving allegation that her employer's decision was based on retaliation does not establish a genuine issue of material fact.").

## IV.    **Retaliation—Constructive Discharge**

In Count IV of his Complaint, Plaintiff alleges he was constructively discharged from his employment with Defendant as a result of retaliation.  (Compl., ¶¶ 64-68).  Specifically, Plaintiff maintains he suffered an adverse employment action, i.e., constructive discharge, because he filed a complaint pursuant to the MHRA and participated in the ensuing investigation and mediation.

As noted above, in order to establish a prima facie case of retaliation under the MHRA, Plaintiff must show:  "(1) he complained of discrimination; (2) the employer took adverse action against him; and (3) a causal connection existed between the complaint and the adverse action." *Griffey*, 2012 WL 10881, at *7 (citation omitted).  Again, Plaintiff need not show that retaliation was a substantial or determining factor in the employment decision; rather, "proving a causal connection between the complaint and the adverse action depends on showing that the complaint was a contributing factor in the adverse action."  *Id.* (citation omitted).

The Missouri Court of Appeals recently delineated the standards for a claim of constructive discharge, as follows:

> A person is constructively discharged when an employer deliberately renders an employee's working conditions so intolerable that the employee is compelled to quit his job.  *Gamber v. Mo. Dept. of Health and Senior Servs.*, 225 S.W.3d 470, 477 (Mo.App. W.D. 2007).  "To effect a constructive discharge, the working conditions must be such that a reasonable person would find them intolerable."  *Id.*  A claim of constructive discharge requires aggravating factors or a continuous pattern of discriminatory treatment.  *Id.*  Evidence of a single instance is insufficient.  *Id.*  Reasonableness requires an employee not to assume the worst, and not to jump to conclusions too quickly.  *Id.*  No constructive discharge occurs where an employee quits without giving the employer a reasonable chance to resolve the problem.  *Id.*  Missouri courts have applied the test for

constructive discharge used by the federal courts for the Eighth and Tenth Circuits:  1) a reasonable person in the employee's situation would find the working conditions intolerable, and 2) the employer intended to force the employee to quit, or the employer could reasonably foresee that its actions would cause the employee to quit.  *Id.*

*DeWalt v. Davidson Surface/Air*, 398 S.W.3d 491, 501 (Mo. App. 2013).

Viewing the facts in the light most favorable to Plaintiff, the Court finds the following incidents transpired after Plaintiff filed his charge of discrimination:

- In June, 2011, Plaintiff got into a verbal altercation with another manager at Store 253.  (Defendant's Facts, ¶ 48).  Pannullo investigated the incident, and although he determined that both individuals had acted inappropriately, he disciplined neither.  (*Id.*, ¶ 49).
- In August, 2011, Plaintiff got into a verbal and physical altercation with a subordinate employee.  (Defendant's Facts, ¶ 50).  Plaintiff admitted to grabbing the employee, which is a violation of Defendant's disciplinary policy.  (Plaintiff's Response to Defendant's Statement of Undisputed Material Facts, ¶ 50; Defendant's Exh. B, P. 26).  Pannullo and Pfeiffer investigated the incident and determined that, although Defendant had the right to terminate Plaintiff's employment for the misconduct, a written warning would suffice.  (Defendant's Facts, ¶ 53).
- Also in August, 2011, Plaintiff admitted to a violation of Defendant's driver's license policy for managers.  (Defendant's Facts, ¶¶ 54-59).  Once again, although Plaintiff's misconduct would have supported the termination of his employment, Pannullo and Pfeiffer decided to issue only a written warning.  (*Id.*, ¶ 62).
- At the conclusion of the meeting in which Plaintiff was issued the August, 2011, written warnings, Plaintiff asked about his future with the company, and Pfeiffer laughed at him.  (Plaintiff's Additional Facts, ¶ 75).
- Shortly after said meeting, Plaintiff informed Pannullo he was considering resigning, and Pannullo responded that "this" would continue if Plaintiff stayed.  (Plaintiff's Additional Facts, ¶¶ 78, 79).[20]
- When Pfeiffer learned that Plaintiff had resigned his employment, she responded as follows:  "Thanks!!!  This is perfect!  Have a GREAT weekend!!"  (Plaintiff's Additional Facts, ¶¶ 84, 85).
- When Pfeiffer was asked how Plaintiff's termination should be classified, "+ or -," she responded:  "Is there such a thing as a HUGE plus??  He walked out middle of shift after Thom and I wrote him up for a few issues.  He has a pending EEOC case and his attorney probably said we were retaliating against him."  (Plaintiff's Additional Facts, ¶¶ 86, 87).

Upon consideration the Court finds Plaintiff fails to establish he was constructively discharged, as a reasonable person in his position would not have found the working conditions

---

[20] As noted above, the meaning of "this" in this situation is unclear.

intolerable. *Watson v. Heartland Health Laboratories, Inc.*, 2014 WL 1920432, at *9 (W.D. Mo. May 14, 2014). With respect to the first three alleged instances of harassment, the Court notes Plaintiff admitted he engaged in the conduct at issue on each occasion. (Defendant's Facts, ¶¶ 48, 50, 54, 58-59). The fact that Plaintiff was disciplined in accordance with Defendant's policies cannot support a claim for constructive discharge. *See Noel v. AT&T Corp.*, 2014 WL 117606, at *14 (E.D. Mo. Jan. 13, 2014) (holding that requiring plaintiff to meet performance expectations is not discriminatory treatment that can provide the legal basis for a constructive discharge claim). As for the next two instances, when Pfeiffer allegedly laughed at Plaintiff's query regarding his future with the company, and Pannullo allegedly stated that "this" would continue if Plaintiff stayed, the Court finds that even assuming they occurred, two instances on the same day are insufficient to constitute the aggravating factors or continuous pattern of discriminatory treatment necessary for a claim of constructive discharge. Furthermore, Plaintiff quit that very day, without allowing Defendant a reasonable chance to resolve the problem. *See Watson*, 2014 WL 1920432, at *9 (finding no constructive discharge when plaintiff failed to give defendant an opportunity to remedy the problem). Finally, the last two instances cited by Plaintiff occurred after he had resigned his employment with Defendant, and thus cannot provide the basis for his claim of constructive discharge. "As in *Gamber*, the conditions of plaintiff's [] job were not intolerable to a reasonable person as a matter of law, and there is no evidence the defendant[] deliberately made plaintiff's work conditions intolerable so that he had to quit." *Noel*, 2014 WL 117606, at *15 (citations omitted). As a result, Plaintiff fails to establish the second element of his prima facie case of retaliation, i.e., that his employer took adverse action against him, and so this portion of Defendant's Motion for Summary Judgment must be granted. *Id.* at *16.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Steak N Shake Operations, Inc.'s Motion for Summary Judgment (ECF No. 20) is **GRANTED**, and Plaintiff's claims are **DISMISSED** with prejudice.  An appropriate Judgment will accompany this Memorandum and Order.

Dated this  11th Day of December, 2014.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE